O

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL CENTER FOR JEWISH FILM, <br><br> Plaintiff, <br><br> v. <br><br> RIVERSIDE FILMS LLC; JOSEPH DORMAN; and DOES 1 through 10, <br><br> Defendants. | Case No. 5:12-cv-00044-ODW(DTBx) <br><br> **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT [25]** |

Before the Court is Defendants Riverside Films LLC and Joseph Dorman's Motion for Summary Judgment. (ECF No. 25.) Defendants seek a judgment that either: Plaintiff National Center for Jewish Film's copyrights are invalid; or that Defendants' use of the alleged copyrighted materials constitutes fair use. For the following reasons, the Court **GRANTS** Defendants' Motion.

## I. FACTUAL BACKGROUND

Plaintiff, a non-profit corporation, archives and distributes films that promote Jewish heritage. (UF ¶ 1.) In July 2011, Defendants released a feature-length documentary, *Sholem Aleichem: Laughing in the Darkness*. (UF ¶ 4.) The film is about a 19th century Yiddish author whose works have remained a cultural touchstone for Jews across the world. (UF ¶ 5.) More than a mere biography, the film examines the last 150 years of Jewish history, covering the transition from the traditional, religiously dominated world of *shtetls* to modern secular life.[1] (UF ¶ 6.) Plaintiff alleges that Defendants, without permission or compensation, used clips of varying

---

[1] Small Jewish market towns in Eastern Europe.

lengths from four of Plaintiff's copyrighted films: (1) *Yiddle with His Fiddle*; (2) *A Letter to Mother*; (3) *Tevye the Milkman*; and (4) *Jewish Luck.* (Opp'n 4.)

While Plaintiff did not register a copyright for *Yiddle* or *Letter* in the U.S., Plaintiff asserts that Joseph Green, the screenplay writer and director of these two films, owned and later assigned his Polish copyrights to Plaintiff in 1990. (Opp'n 1–2.) Plaintiff also contends that in 1996, the U.S. Copyright Office restored the copyright in *Yiddle* and *Letter.* (Opp'n 8–9.) In 1997, Plaintiff registered the assignment and its restored and assigned copyrights for *Yiddle* and *Letter* with the U.S. Copyright Office. (Opp'n 1–2.)

Regarding *Tevye* and *Jewish Luck*, Plaintiff avers it registered the English prologues and English subtitles as derivative works in 1981 and 2011, respectively. (Opp'n 2–3.) Plaintiff concedes that, as with any derivative work, it did not register the original films. (UF ¶¶ 27, 32.) Defendants do not dispute that Plaintiff registered the English prologues and subtitles as derivative works. (Reply 4.)

Attempting to enforce their copyrights, Plaintiff filed a complaint alleging seven claims against Defendants for: (1) copyright infringement; (2) vicarious and contributory copyright infringement; (3) unfair competition under California Business and Professions Code section 17200; (4) unfair competition under section 43(a) of the Lanham Act; (5) common law unfair competition; (6) injunctive relief; and (7) declaratory relief.

Defendants now seek summary judgment on all claims and assert the fair use defense, arguing their limited use of short clips from the four films, along with other factors such as the nature of the four films and the purpose of the use, constitutes fair use under 17 U.S.C. § 107. (Mot. 10–11.)

Defendants also argue that Plaintiff either owns no copyright or a limited copyright in the four films. Specifically: (1) Defendants dispute whether Green owned or later assigned any Polish copyrights in either *Yiddle* or *Letter*, and whether Green could have conveyed to Plaintiff any interest at all, since *Yiddle* and *Letter* were

1    in the public domain (Mot. 9); and (2) Defendants contend that Plaintiff's copyrights

2    in *Tevye* and *Jewish Luck* protect only the English prologues and subtitles in those two

3    films, and not the films as a whole.  (Mot. 10.)

4                        **II.    LEGAL STANDARD**

5          Summary judgment should be granted if there are no genuine issues of material

6    fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

7    P. 56.   The moving party bears the initial burden of establishing the absence of a

8    genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

9    Once the moving party has met its burden, the nonmoving party must go beyond the

10   pleadings and identify specific facts that show a genuine issue for trial.  *Id.*

11         A genuine issue of material fact must be more than a scintilla of evidence, or

12   evidence that is merely colorable or not significantly probative.  *Addisu v. Fred*

13   *Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  A disputed fact is "material" where

14   the resolution of that fact might affect the outcome of the suit under the governing

15   law.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968).   An issue is

16   "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the

17   nonmoving party.  *Id.*  Where the moving and nonmoving parties' versions of events

18   differ, courts are required to view the facts and draw reasonable inferences in the light

19   most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

20         Further, the Court need not "scour the record in search of a genuine issue of

21   triable fact"—it is the nonmoving party's responsibility to "identify with reasonable

22   particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91

23   F.3d 1275, 1279 (9th Cir. 1996).  Finally, conclusory or speculative testimony in

24   affidavits and moving papers is insufficient to raise genuine issues of fact and defeat

25   summary judgment.  *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730,

26   738 (9th Cir. 1979).

27   / / /

28   / / /

# III.   DISCUSSION

As a practical matter, the Court notes that there could be a genuine issue as to copyright ownership and restoration; but a finding against Plaintiff on fair use would render moot, as far as this case is concerned, any discussion of copyright ownership. Thus, the Court first considers the question of fair use.

## A.   The Defense of Fair Use

To establish a claim of copyright infringement, Plaintiff must show ownership of the copyright and copying by Defendants.  *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817 (9th Cir. 2003).  Fair use of a copyrighted work, however, is not an infringement.  17 U.S.C. § 107.  The fair use doctrine exists to preserve the future use of artistic works for purposes of criticism, comment, reporting, teaching, scholarship, and research.  *Id.*

Fair use is a mixed question of law and fact.  *Harper & Row, Publ'rs, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985).  Courts weigh four factors to determine whether a use is fair: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use on the potential market or value of the copyrighted work.  17 U.S.C. § 107; *Harper*, 471 U.S. at 560–61.  The Court discusses each factor in turn.

### 1.   *The purpose and character of the use*

The question here is whether the new work supplants the original; or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message—that is, whether the new work is "transformative."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).  Although a finding of a new work's transformative nature is not absolutely necessary for fair use, such works lie at the heart of the fair use doctrine's guarantee of "breathing space within the confines of copyright."  *Id.*

/ / /

Here, Plaintiff argues Defendants merely added a voiceover to the original scenes depicting *shtetls*, and therefore their use is not transformative.  (Opp'n 16.)  Plaintiff cites *Los Angeles News Service*, where a news-clip-licensing company shot video of the Reginald Denny beating from its helicopter with its own equipment.  *Los Angeles News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1120 (9th Cir. 1997).  And KCAL, a competitor, used the video without permission and compensation.  *Id.* at 1120.  The district court granted summary judgment for KCAL, finding that its telecasts of the video were fair use for purposes of news reporting.  *Id.*  But the Ninth Circuit reversed after rebalancing the fair-use factors.  *Id.* at 1123.

But this case is different.  Here, Defendants' voiceovers, editing, and overall production adds something new to the underlying works.  In *Los Angeles News Service*, KCAL's voiceovers narrating the Denny beating did not alter the meaning or arrangement of the heart of the claimed work—the unique camera angles and clarity of the images.  *Id.* at 1122.  But here, Defendants use short video clips obtained from the copyrighted works—e.g., snippets of *shtetl* scenery—in a montage with other non-copyrighted scenes.  Even the longer video clips—e.g., the scene in *Tevye* depicting the protagonist's struggles with his daughter's rejection of the Jewish faith—are buttressed with other scenes and commentary that explain the relevance and background of the video clip.  Scholarly commentary runs throughout *Sholem Aleichem* and does more than mere narration.  This documentary aims to teach and enlighten its audience about Aleichem's work and Jewish history.  Based on the Court's review of the alleged infringing scenes in *Sholem Aleichem*, the Court finds that Defendants' use is transformative.

Plaintiff also argues that Defendants' commercial exploitation of the short video clips is dispositive.  (Opp'n 17.)  But relevant case law dictates that a work's commercial or nonprofit character is not conclusive.  *Campbell*, 510 U.S. at 584.  The fact that a use of a copyrighted work was for a nonprofit, educational purpose does not insulate it from infringement.  *Id.*  Likewise, commercial use does not bar a finding of

fair use.   *Id.* at 584–85.   And the more transformative the new work, the less significance the other factors matter.   *Id.* at 578.   Accordingly, the Court finds that this factor favors Defendants.

### 2.      The nature of the copyrighted work

This factor recognizes that some works are closer to the core of intended copyright protection than others.   *Kelly*, 336 F.3d at 820.   For instance, fair use is more difficult to establish when fictional works or films are at issue.   *Id.*   But use of published works (as opposed to unpublished works) is more likely to qualify as fair use because the first appearance of the artist's expression has already occurred.   *Id.*

Plaintiff contends the very essence of its copyrighted works fits squarely within the scope of this factor; since they are fictional films.   (Opp'n 18–19.)   Defendants respond that this factor should favor them because the films had already been published a long time.   (Mot. 17.)   Further, for *Tevye* and *Jewish Luck*, the copyrighted material is not the scene itself, but only the (technical) English subtitles. (*Id.*)   For at least those two films, the Court finds that the creative element is severely lacking, as it is very easy with today's technology to translate the dialogue and reproduce the English subtitles.   And for all four films, they are very old, and possibly in the public domain.   Upon considering the parties' arguments for this factor, the Court finds that this factor weighs slightly in Defendants' favor.

### 3.      The amount and substantiality of the portion used in relation to the copyrighted work as a whole

The third factor asks whether the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying.   *Campbell*, 510 U.S. at 586.

The parties do not dispute Defendants' use of the four films as follows:

- 7 clips used from *Yiddle* and *Letter*: of that, 22 seconds are from *Yiddle*, representing 0.4% of the run time of *Yiddle*; and 41 seconds are from *Letter*, representing 0.6% of the run time of *Letter*.

- 13 clips from *Jewish Luck* totaling 37 seconds, representing 0.6% of the run time of *Jewish Luck*.

- 9 clips from *Tevye* totaling 1 minute and 24 seconds, representing 1.5% of the run time of *Tevye*.[2]

(UF ¶¶ 42–44, 47–50, 54–57.)

But Plaintiff contends Defendants' choice of clips from the four films were substantial in quality—conceding that while the quantity used was small, the portions taken were the heart of the copyrighted films.  (Opp'n 20–21.)

Plaintiff rely on several cases where courts have weighed the amount-and-substantiality factor in the copyright holders' favor, despite the small quantity of the portions used.  In *Los Angeles News Service*, the defendant used 30 seconds of footage from the four-minute original video; this, the court noted to be "only a small part," but found that it was the heart of the work—"the best of the . . . footage."  *Los Angeles News Service*, 108 F.3d at 1122.  And in *Harper*, the Supreme Court found that the defendant's verbatim copying of small portions of President Ford's unpublished memoirs, tipped this factor in the copyright holder's favor because those portions "qualitatively embodied Ford's distinctive expression."  *Harper*, 471 U.S. at 560–61.  Finally, Plaintiff offers *Roy*, where after a jury verdict for the copyright holder, the district court concluded that the jury could reasonably have found that the defendant's use of short portions of Charlie Chaplin's films was "qualitatively great."[3]  *Roy Exp. Co. Establishment of Vaduz v. Columbia Broad. Sys. Inc.*, 503 F. Supp. 1137, 1145 (S.D.N.Y. 1980).

---

[2] These figures for *Jewish Luck* and *Tevye* assume that Plaintiff's copyrights cover the entire film itself.  Assuming that the copyrights only cover the English subtitles, the quantity of the clips containing the English subtitles is significantly less.

[3] The defendant used clips from 5 films: 1 minute and 45 seconds from *City Lights*, which ran for 1 hour and 23 minutes; 3 minutes and 45 seconds from *The Kid*, which ran for 1 hour; 1 minute and 25 seconds from *The Circus*, which ran for 1 hour and 12 minutes; 55 seconds from *Modern Times*, which ran for 1 hour and 29 minutes; and 1 minute and 15 seconds from *The Gold Rush*, which ran for 1 hour and 12 minutes.  *Roy*, 503 F. Supp. at 1145.

The Court does not find that the clips Defendants used from the four films were highly substantive; and instead finds that the use was minimal—both quantitatively and qualitatively.  For instance, the clips used from *Yiddle* and *Letter* depict Jewish life within *shtetls*.  At best, these are background scenes, mere transitions between other, more important scenes.  The Court finds no merit Plaintiff's argument that these *shtetls* scenes are the heart of *Yiddle* and *Letter*.  Further, Plaintiff's copyrights in *Jewish Luck* and *Tevye* are only for the English subtitles.  And Plaintiff's contention that those subtitles are the heart of the films—even if the copied scenes themselves are the heart of the film—is meritless; the Court cannot conceive how English subtitles can be considered anything but ancillary.  Accordingly, this factor also favors Defendants.

### 4.     *Effect of the use on the potential market or value of the copyrighted work*

When commercial use amounts to mere duplication of a work's entirety, it supersedes the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur.  *Campbell*, 510 U.S. at 591.  But when the second use is transformative, this market harm is less certain.  *Id.*

Plaintiff avers Defendants' documentary serves as a market replacement for the copyrighted films.  (Opp'n 14–15.)  But this argument fails because Defendants' *Sholem Aleichem* does not duplicate the copyrighted films.  Further, the Court is unconvinced that the use of the copyrighted clips—as background for scholarly commentary—in *Sholem Aleichem* would dissuade consumers from patronizing the original full-length films.  It is difficult to imagine that *Sholem Aleichem* competes with Plaintiff's four films in the same market space.  The Court agrees with Defendants that the opposite is likely true, that *Sholem Aleichem* caused a newfound interest in Plaintiff's copyrighted films.  (Reply 9.)  Thus, this factor also favors Defendants.

/ / /

### 5.    Bad faith

Finally, Plaintiff argues Defendants' fair use defense should fail because they acted in bad faith.  (Opp'n 12–13.)   Plaintiff contends Dorman contacted Plaintiff before using the copyrighted clips; obtained copies of the copyrighted films from Plaintiff; and then used the clips without paying Plaintiff a nominal licensing fee of $12,000.  (Opp'n 13–14.)  Further, Plaintiff insists that its licensing fee of $12,000 is modest compared to the $1M in revenues received for *Sholem Aleichem*.  (Opp'n 14.) But Defendants argue that they obtained the clips from *Yiddle* and *Letter* through an archival clip licensing company.  (Mot. 4.)

While this is not a factor in the determination of fair use, bad faith can bar the defense of fair use entirely.  *See Fisher v. Dees*, 794 F.2d 432, 437 (9th Cir. 1986). Plaintiff repeatedly asserts that Defendants' failure to obtain Plaintiff's permission to use the clips, and failure to compensate Plaintiff for the licensed use, disrobes Defendants of their fair use defense.   (Opp'n 14.)   But the Court finds that Defendants' acts are reasonable—especially in the light of Plaintiffs' tenuous copyrights and Defendants' belief in its fair-use rights—and finds that these acts do not amount to bad faith.

In summary, all of the fair use factors weigh in Defendants' favor; and the Court concludes that *Sholem Aleichem* use of Plaintiffs' four films deserves fair-use protection as a matter of law.  And because the Court has found fair use, the Court declines to opine on the issues surrounding copyright ownership.[4]

## B.    Other Causes of Action

Because the Court has found fair use, the Court agrees with Defendants' arguments that Plaintiff's other claims for unfair competition, injunctive relief, and

---

[4] The Court also declines to delay ruling on this motion so that Plaintiff may depose Defendant Dorman.  The Court finds that the evidence provided by the parties on this motion is sufficient to support a finding of fair use, and Dorman's deposition will unlikely conjure up an issue of material fact concerning fair use.

1  declaratory relief are moot since they all rely on (or are preempted by) the underlying
2  copyright claim.  (Reply 10–12.)
3                                    **IV.   CONCLUSION**
4          Having found that Defendants' alleged acts of copyright infringement are
5  protected by the fair-use doctrine, Defendants' Motion for Summary Judgment is
6  **GRANTED**.  Defendants must file a motion for attorney's fees and costs, if they so
7  desire, within 21 days.  All remaining dates for this case are hereby **VACATED**.
8          **IT IS SO ORDERED.**
9
10         September 14, 2012
11
12  _____
13                              **OTIS D. WRIGHT, II**
14                     **UNITED STATES DISTRICT JUDGE**
15
16
17
18
19
20
21
22
23
24
25
26
27
28